UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VALASSIS COMMUNICATIONS, INC.,

                Plaintiff,                CIVIL ACTION NO. 06-10240

           v.                  DISTRICT JUDGE JOHN FEIKENS

NEWS AMERICA INCORPORATED,    MAGISTRATE JUDGE VIRGINIA M. MORGAN
INC., et al.,

                Defendants.

_____/

## REPORT AND RECOMMENDATION

## I.  Introduction

      Valassis Communications, Inc. (hereinafter "Valassis") filed suit against News America

Incorporated, New America Marketing FSI, and News America Marketing In-Store Services,

Inc. (hereinafter, collectively, "News"), alleging claims under §§ 1-3 of the Sherman Act, 15

U.S.C. §§ 1-3, a claim of tortious interference with a business relationship or expectancy,

presumably brought under Michigan law,[1] unfair competition claims under the laws of

Connecticut (Conn. Gen. Stat. § 42-110a *et seq*.), Nebraska (Neb. Rev. Stat. § 59-1601 *et seq*.),

North Carolina (N.C. Gen. Stat. § 75-1.1 *et seq*.), South Carolina (S.C. Code Ann. § 39-5-10 *et

seq*.), Utah (Utah Code Ann. § 13-5-2.5 *et seq*.), and Washington (Wash. Rev. Code § 19.86.020

---

[1]The complaint does not identify the state law on which this claim is premised.

-1-

*et seq.*), an unfair trade practice claim under California law (Cal. Bus. & Prof. Code § 17000 *et seq.*), and a claim under California's Cartwright Act (Cal. Bus. & Prof. Code § 16720 *et seq.*).

News filed a motion to dismiss Valassis' complaint pursuant to Fed.R.Civ.P. 12(b)(6). By order dated June 12, 2006, the district court referred the motion to this court for Report and Recommendation. The court heard oral argument on July 20, 2006, and took the matter under advisement. For the reasons stated below, the court recommends that the News Defendants' motion be conditionally granted as to Valassis' federal claims and granted as to the state law claims.

## II. Background

Free Standing Inserts (hereinafter "FSIs") are marketing devices utilized by consumer packaged goods manufacturers (hereinafter "CPGMs") to reach consumers via the delivery of newspapers. Valassis and News "are the two principal, if not only, providers of FSIs in the United States." Compl. ¶ 3. CPGMs purchase FSIs, which consist of coupons for products offered by a CPGM, from Valassis and News for placement in newspapers throughout the United States. According to Valassis, FSIs provide a means for CPGMs to efficiently market their products to up to 70 million households on a weekly basis.

Valassis alleges that News has engaged in an unlawful scheme to eliminate competition in the FSI market. According to Valassis, News has monopolistic or near-monopolistic power in a related, but distinct, market – the in-store advertising and promotions market – and is attempting to leverage its power in that market to eliminate competition in the FSI market. In-store products, like FSIs, are utilized by CPGMs to attract consumers to their products. Whereas

FSIs are designed to attract consumers to products in advance of a shopping trip, in-store devices, such as at-the-shelf coupon dispensers and shopping cart advertisements, are designed to draw consumers to a CPGM's products at the point of purchase.  Valassis asserts that News has achieved monopolistic or near-monopolistic power in the in-store promotions and advertising market by entering into exclusive contracts with retailers that preclude the installation of in-store marketing devices by anyone other than News.  According to Valassis, News has entered into such contracts with the "vast majority of the largest grocery retailers in the United States" and that by the execution of such contracts, News has "effective[ly] prevent[ed] competition in that market."  Compl. ¶ 18.

The crux of Valassis' complaint is that News has used these contracts to coerce CPGMs into purchasing FSIs exclusively from News by threatening to charge CPGMs significantly more for in-store promotions and advertising products if they should choose to purchase FSIs from Valassis, leaving the CPGMs with no choice but to either purchase both FSIs and in-store devices from News or forgo utilizing such marketing devices altogether.  Valassis alleges that News' use of threats to coerce CPGMs into purchasing FSIs exclusively from News effectively creates an unlawful tying arrangement and that News has substantially harmed competition in the FSI market.  Valassis also claims that News has engaged in unlawful predatory pricing, that it has interfered with Valassis' business relationships or expectancies, and that it has engaged in unfair trade practices.

News dismisses Valassis' cause of action as nothing more than an attempt by an inferior competitor to level the playing field by resort to antitrust laws.  News contends that Valassis has

failed to allege a viable cause of action under either federal or state law and, therefore, that the complaint should be dismissed in its entirety.

## III.  Analysis

### A.  Standard of Review

News seeks dismissal of Valassis' complaint pursuant to Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests whether, "as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993).[2]  When reviewing such a motion, the court must construe the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's factual allegations as true. Bloch v. Ribar, 156 F.3d 673, 677 (6th Cir. 1998).  However, the court "need not...accept as true legal conclusions or unwarranted factual inferences." Kottmyer v. Mass, 436 F.3d 684, 688 (6th Cir. 2006).  Dismissal under Rule 12(b)(6) is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Bloch, 156 F.3d at 677.

There is no heightened pleading standard in anti-trust cases.  Rather, the liberal notice pleading standard of Fed. R. Civ. P. 8(a) applies.  See Foundation for Int. Design v. Savannah College, 244 F.3d 521, 530 (6th Cir. 2001).  Under this standard, a plaintiff need not set forth in detail the facts upon which his claim rests.  Rather, "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and

---

[2]News submitted several exhibits in support of its motion, and the parties argue as to whether those exhibits may be considered in deciding the motion.  Matters outside of the pleadings ordinarily are not addressed in deciding a motion to dismiss under 12(b)(6). Kostrzewa v. City of Troy, 247 F.3d 633, 643 (6th Cir. 2004).  The court did not consider the exhibits in deciding News' motion.

-4-

the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80

(1957); see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507

U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); E.E.O.C. v. J.H. Routh Packing Co., 246

F.3d 850, 851 (6th Cir. 2001).  Nonetheless, the "essential elements of a private antitrust claim

must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint

on a defendant's 12(b)(6) motion."  Foundation for Int. Design, 244 F.3d at 530.

## B.  Count One – Tying Claim Under § 1 of the Sherman Act

As noted above, Valassis alleges that News has created a tying arrangement between its

in-store promotional products and its FSIs by threatening to impose a severe "financial penalty"

upon any CPGM that purchases in-store products from News but declines to purchase FSIs from

News.  Valassis claims that this tying arrangement constitutes a violation of § 1 of the Sherman

Act, 15 U.S.C. § 1.

Section 1 of the Sherman Act renders unlawful "[e]very contract, combination in the

form of trust or otherwise, or conspiracy" that unreasonably restrains trade or commerce.  State

Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)("Although the Sherman

Act by its terms, prohibits every agreement 'in restraint of trade,' this Court has long recognized

that Congress intended to outlaw only unreasonable restraints.").  Tying arrangements that

unreasonably restrain trade fall within the ambit of § 1 of the Sherman Act.  As the Supreme

Court stated in Illinois Tool Works v. Independent Ink, __ U.S. __, 126 S.Ct. 1281, 1286, 164

L.Ed.2d 26 (2006)(quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 104 S.Ct.

1551, 80 L.Ed.2d 2 (1984)):

> [T]he essential characteristic of an invalid tying arrangement lies
> in the seller's exploitation of its control over the tying product to

force the buyer into the purchase of a tied product that the buyer
either did not want at all, or might have preferred to purchase
elsewhere on different terms.  When such "forcing" is present,
competition on the merits in the market for the tied item is
restrained and the Sherman Act is violated.

A tying claim may be examined under either a *per se* analysis or a rule of reason analysis.
In order to prevail upon a *per se* tying claim, the plaintiff must plead and prove (1) that two
separate product markets exist, (2) that the seller has substantial market power in the tying
product market, (3) that the seller has conditioned the purchase of the tying product upon the
purchase of the tied product, and (4) that the tying arrangement "'affects a substantial volume of
commerce in the tied market.'"  PSI Repair Services, Inc. v Honeywell, Inc., 104 F.3d 811, 815
(6th Cir. 1997)(quoting Eastman Kodak Co. Image Techincal Servs., Inc., 504 U.S 451, 462, 112
S.Ct. 2072, 119 L.Ed.2d 265 (1992)); see also Virtual Maintenance, Inc. v. Prime Computer,
Inc., 11 F.3d 660, 664 n.6 (6th Cir. 1993).[3]  Under a rule of reason analysis, the plaintiff must
plead and prove, in addition to the elements listed above, that the tying arrangement is likely to
cause anticompetitive effects in the tied product market.  PSI Repair, 104 F.3d at 811.[4]

### (i).  Relevant Markets

[3]In Illinois Tool Works, supra, __U.S.__, 126 S.Ct. at1293, 164 L.Ed.2d. 26, the Supreme
Court put to rest any lingering doubt as to whether market power was an element of a *per se*
tying claim, stating that "in all cases involving a tying arrangement, the plaintiff must prove that
the defendant has market power in the tying product."

[4]In addition, under either analysis, Sixth Circuit precedent requires a showing that "'the
plaintiff has suffered an antitrust injury as a result of the tying arrangement.'" Ctunify, Inc. v.
Nortel Networks, Inc., 115 Fed.Appx. 831, 834 (6th Cir. 2004)(quoting Valley Prods. Co. v.
Landmark, Div. of Hospitality Sys., Inc., 128 F.3d 398, 402-03 (6th Cir. 1997)).  News does not
contend that Valassis has failed to allege an antitrust injury.

-6-

The parties hotly dispute the question of whether the facts alleged in the complaint are sufficient to establish that two separate product markets exist.  Again, Valassis alleges that News is using its market power in the "in-store advertising and promotions" market to coerce CPGMs into purchasing FSIs exclusively from News.  News characterizes these purported markets as "economically nonsensical" and "implausible," arguing that the markets identified by Valassis are too narrowly drawn, and that FSIs and in-store promotional tools are similar products that are both part of the broader advertising and promotions market.  Valassis, of course, disagrees, arguing that there are significant differences between FSIs and in-store devices, as well as other advertising and promotions tools, and that a separate market exists for FSIs and in-store devices. While News has raised some significant questions regarding the viability of the alleged markets, the court concludes that Valassis has sufficiently alleged the existence of two separate product markets to withstand a 12(b)(6) motion to dismiss.

"Market definition is a highly fact-based analysis that generally requires discovery." Foundation for Int. Design, supra, 244 F.3d at 531; see also Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2nd Cir. 2001)("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3rd Cir. 1997)("It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.").  That is not to say that dismissal at the pleading stage is never warranted.  See, e.g., Queen City Pizza, 124 F.3d at 443 (dismissing suit on 12(b)(6) motion upon a finding that "the proposed tying market – the market in Domino's approved dough – is not a relevant market for antitrust purposes.").  Rather, it is simply to say

that in most cases, determining whether a proposed market constitutes a relevant market for antitrust purposes cannot be determined on the pleadings alone.

"The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service." White and White, Inc. v. American Hosp. Supply Corp., 723 F.2d 495, 500 (6th Cir. 1983)(citing United States v. E.I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). This "reasonable interchangeability" test focuses on "(1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." White and White, Inc., 723 F.3d at 500. Submarkets may exist within a single product market, "which, in themselves, constitute product markets for antitrust purposes." Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). "The boundaries of...a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. Submarket analysis does not replace traditional marketplace analysis. It merely provides additional factors for consideration "so as to more precisely define the market affected by the defendant's actions." White and White, Inc., 723 F.3d at 500; see also Worldwide Basketball & Sport Tours v. NCAA, 388 F.3d 955, 961-62 (6th Cir. 2004).

-8-

Valassis identifies the tied product market as the "FSI coupon business," which is alleged to consist of "coupon booklets that are inserted into newspapers throughout the United States at various intervals throughout the year."  Compl. ¶ 12.  Valassis alleges that FSIs are "separate and distinct from other promotional products in numerous respects, leaving them without a reasonably interchangeable substitute."  Compl. ¶ 13.  Valassis claims that FSIs provide CPGMs with the following unique advantages:

(1) The ability to reach nearly 70 million households weekly;
(2) An efficient newspaper-delivery based distribution system;
(3) A cost-effective means to reach a large number of consumers;
(4) A low cost structure per coupon redeemed;
(5) The ability to target the consumer who determines in advance of shopping the products he or she will purchase and is thus induced to seek out a particular item by an FSI;
(6) The ability to "provide a sufficiently diversified collection of CPG offerings which are available at a single local retain outlet for the consumer."

Compl. ¶ 13(a)-(g).  Valassis further alleges that "[n]o single marketing alternative accomplishes more marketing objectives which include, but are not limited to: (i) increased retail merchant sell-in; (ii) increase in retail merchant support, (iii) ability to drive traffic to retailer; (iv) drives incremental volume to retailers and manufacturers; (v) ability to build brand awareness; (vi) ability to build brand image; (vii) ability to attract new customers to brand; and (viii) ability to provide customer rewards for loyalty."  Compl. ¶ 13(g)(i)-(viii).  With respect to the question of cross-elasticity of demand, Valassis alleges that "[b]ecause of the unique characteristics and audience of FSIs, if the prices of FSIs were to rise, the CPGs would not significantly alter their FSI strategy.  As such, FSI prices are not effectively constrained by other promotional devices, particularly other forms of offering, displays or advertising.  Accordingly, there is low cross-elasticity of demand between FSIs and other forms of marketing, advertising or display efforts."

-9-

Compl. ¶ 15.  Finally, Valassis alleges that the FSI market "has unique characteristics that make

entry into the FSI market both extremely difficult and expensive."  Compl. ¶ 16.

Thus, Valassis has alleged that FSIs bear several unique characteristics that render them

unlike any other marketing or promotional tool and that as a result of these unique

characteristics, CPGM purchasing behavior is not affected by FSI price, i.e., there is a low cross-

elasticity of demand between FSIs and other marketing and promotional devices.  News claims,

however, that FSIs are, in fact, interchangeable with other marketing tools, such as in-store

coupons, direct mail coupons, and CPGM-published FSIs, and that Valassis' relevant market

allegations are thus unduly narrow.  In support of its argument, News cites to Menasha v. News

America Marketing In-Store, 354 F.3d 661 (7th Cir. 2004), in which the Seventh Circuit

affirmed a district court's order granting summary judgment to News in an antitrust case brought

by an at-shelf coupon distributor.  In affirming the dismissal, the Court suggested that in-store

devices and FSIs were part of the same market:

> Menasha had an uphill battle to show that at-shelf coupon
> dispensers are a distinct market, in the sense that a reduction in
> output of at-shelf coupons will create higher prices for promotional
> devices.  These dispensers may be physically distinct from
> newspaper coupons or stuck-to-the-product-box coupons, but that
> differs from creating separate markets.  Otherwise [News
> America's] electromechanical dispensers and Menasha's cardboard
> boxes would be in different and Menasha's case would collapse.
> Menasha's problem instead is that, as customer attractants, at-shelf
> coupons compete against signs and placards, end caps (product
> racks at the end of aisles), sales, coupons included on (or in) the
> product's package, coupons distributed at the checkout counter,
> and against the traditional coupons distributed by mail or
> newspaper.  What would lead a reasonable person to think that the
> leading supplier of one form of coupon has the power to drive up
> price, given the plethora of substitutes?

-10-

Menasha, 354 F.3d at 664.  The Seventh Circuit's ruminations about the interchangeability of various marketing tools certainly raise questions about the viability of the relevant markets alleged by Valassis.  However, as the opinion makes clear, dismissal of Menasha's case was based upon a failure of proof.  The Court criticized the methodology Menasha chose in attempting to prove that a separate market existed for at-shelf coupon dispensers, concluding that it was based upon largely irrelevant factors.  The Court did not hold that the market allegations were insufficient to withstand a motion to dismiss.

It may well be true that direct mail coupons, in-store devices, and other marketing tools are suitable substitutes for FSIs, as News contends, but that is a question that cannot be decided on the pleadings alone.  The court has no basis to determine at the pleading stage whether CPGMs view these marketing tools as essentially interchangeable, or whether, as Valassis alleges, FSIs provide such unique advantages in targeting customers that there is no comparable marketing device.  Valassis might well face an uphill battle to show that FSIs constitute a distinct market for antitrust purposes.  Nonetheless, in the court's view, Valassis' allegations regarding the FSI market are not economically implausible and are sufficient to withstand a motion to dismiss.[5]

Turning to the tying product market, Valassis alleges that the "the relevant in-store advertising and promotions market consists of several products including an 'at-the-shelf coupon dispenser,' shelf advertising, floor advertising, shopping cart advertisements and other

---

[5]News also argues that Valassis has failed to take "supply-side substitution" into account in defining the FSI market.  The Sixth Circuit recently rejected such an argument in NicSand, Inc. v. 3M Company, 457 F.3d 534 (6th Cir. 2006), concluding that at the pleading stage, an antitrust plaintiff need not account for supply-side substitution in defining the relevant markets.

promotion and advertising products designed to persuade the shoppers at the time of purchase in

supermarkets, drug stores and certain retail outlets throughout the United States to purchase

particular products."  Compl. ¶ 17.  Valassis further alleges that in-store promotional tools "have

a number of distinctive features which leave them without a reasonably interchangeable

substitute," and that they differ "from various outside the store promotions" because they,

quoting directly from Valassis' brief:

> (1) attract customer attention at moment of purchase decision;
> (2) offer intrusive, more visible advertising in a clutter free environment that the potential customer must view;
> (3) differentiate the brand at the shelf;
> (4) help the consumer when the consumer is comparison shopping;
> (5) attract a different type of customer who is not responsive to other advertising methods;
> (6) offer instant gratification to customer via immediate price savings;
> (7) require relationship with retailer and contractual obligation with retailer;
> (8) do not have a distribution system inherent in advertising; Advertising and promotion must be placed at point of use.

Compl. ¶ 22(a)-(i).  Valassis further alleges that "[i]n particular, FSIs are not reasonably

interchangeable with in-store marketing and promotions.  The FSI targets consumers before the

consumers enter the store, the decision to clip the coupon for use in shopping is made prior to the

shopping trip, and relationship with the retailer is not required to distribute coupons to the

shopper.  Moreover, the cost, reach, and effectiveness of the FSIs and in-store programs differ."

Id.

As with FSIs, Valassis alleges that in-store marketing and promotional tools offer unique

advantages that other marketing and promotions tools do not and, therefore, that there is no

reasonably interchangeable substitute for in-store products.  Many of the factors Valassis cites as

demonstrating the uniqueness of in-store marketing and promotional appear to be of questionable

-12-

relevance.  For instance, the fact that these devices require a contractual relationship with the retail establishment or are distributed in a different manner than FSIs might differentiate them from FSIs and other marketing tools, but the court cannot see how this difference bears any relationship to the fundamental questions of substitutability or cross-elasticity of demand. Nonetheless, Valassis has offered a plausible theory as to why in-store devices are not reasonably interchangeable with other marketing and promotional devices.  If, as Valassis' allegations suggest, there is a certain type of consumer that responds only to in-store promotional tools, CPGMs may well view in-store products as an indispensable component of their marketing efforts such that they would continue to purchase these products regardless of price.  Whether that is true cannot be determined without some discovery.  While it is a close question, the court concludes that Valassis has sufficiently alleged a relevant tying product market to withstand News' motion to dismiss.

Based on the foregoing, the court concludes that Valassis' has adequately alleged the existence of distinct tying-product and tied-product markets.  Valassis' allegations on this element of its tying claim are certainly not compelling.  However, as noted above, "[m]arket definition is a highly fact-based analysis that generally requires discovery."  Foundation for Int. Design, supra, 244 F.3d at 531.  Valassis' market definitions are not facially implausible, and the court is in no position at this stage of the case to determine whether the alleged markets are, in fact, viable markets for antitrust purposes.

### (ii).  Market Power

Having concluded that Valassis' complaint contains sufficient relevant market allegations, the court must next address the question of whether Valassis has alleged sufficient facts to show that News has market power in the tying product market.

Market power is the power "to force a purchaser to do something that he would not do in a competitive market."  Jefferson Parish, supra, 466 U.S. at 14, 104 S.Ct. 1551.  "It has been defined as 'the ability of a single seller to raise price and restrict output.'"  Eastman Kodak, supra, 504 U.S. at 464, 112 S.Ct. 2072 (quoting Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 503, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)).  "The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market."  Eastman Kodak, 504 U.S. at 464, 112 S.Ct. 2072.  The Sixth Circuit has indicated, as a general rule, that market power cannot exist unless the defendant's share of the tying market is in excess of thirty percent.  PSI Repair Services, Inc., supra, 104 F.3d 811, 818 ("A thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power."); see also, e.g., Metzler v. Bear Auto. Serv. Equip. Co., 19 F.Supp.2d 1345, 1361 (S.D. Fla. 1998)("Market shares below 30 percent are generally insufficient, as a matter of law, to constitute market power in tying and monopolization cases.").

Valassis alleges that News possesses substantial market power in the in-store advertising and promotions market, which, to reiterate, Valassis defines as follows:

> The relevant in-store advertising and promotions market consists of several products including an "at-the-shelf coupon dispenser," shelf advertising, floor advertising, shopping cart advertisements and other promotion and advertising products designed to persuade shoppers at the time of purchase in supermarkets, drug stores and certain retail outlets throughout the United States to purchase

-14-

particular products.  The CPGs who are the principal purchasers of
the FSIs are also the main purchasers of in-store advertising and
promotion products.

Compl. ¶ 17.  Valassis' allegations of market power are based upon a series of exclusive

contracts News is alleged to have executed with several major grocery chains that preclude

providers other than News from placing advertising and promotions products in those chains'

retail stores.  According to Valassis:

> 18.  The in-store advertising and promotion market is currently
> dominated by NEWS.  On information and belief, NEWS market
> share captures under exclusive contract the vast majority of the
> largest grocery retailers in the United States and is of such a
> significant magnitude to effectively prevent competition in that
> market.
>
> 19.  NEWS has enhanced this monopoly position by entering into
> exclusive contracts with a majority of the retail grocery chains in
> the United States.  The exclusive contracts provide that the chain
> of stores will not permit installation of in-store advertising and
> promotion products by any party other than NEWS.  Consequently,
> a CPG that desires in-store advertising and promotion products has
> no alternative but to acquire its in-store advertising and promotion
> products from NEWS, particularly if the CPG seeks nationwide or
> broad regional coverage for its promotion campaign, which is
> typically critical to the success of the campaign.  These exclusive
> contracts are a substantial barrier to entry into the in-store market.
>
> 20.  An example of the exclusive arrangements with retailers in
> NEWS' exclusive contract with Safeway, Inc. which was
> announced by NEWS on August 26, 2004.  The agreement has a
> ten year term that assures that NEWS is the exclusive third party
> provide of in-store advertising and promotions at Safeway stores
> throughout the United States.
>
> 21.  Based upon information and belief, NEWS has similar
> exclusive arrangements with a majority of the other national
> grocery chains, including, but not limited to Kroger, Albertsons,
> Ahhold and Winn Dixie.  Kroger, Albertsons and Safeway are by
> far the three largest grocery chains in the United States.  Kroger,
> Albertsons, Safeway, Ahold and Winn Dixie generated

-15-

> approximately $170,000,000,000 in revenue is 2004.  Total
> revenue for the ten largest grocery retailers during calendar year
> 2004 was approximately $249,000,000,000.  As a result, the
> revenue from only these five chains is greater than 68% of the
> combined revenue for the ten largest grocers in the United States,
> making it virtually impossible for a CPG to advertise in-store
> without contracting with NEWS.

Compl. ¶¶ 18-21.  Valassis also alleges that "[t]he effect, at least in part, of these highly

restrictive exclusive contracts is to make entry into the in-store advertising and promotions

market a virtual impossibility."  Compl. ¶ 24(d).

    These allegations are insufficient to demonstrate that News possesses sufficient power in

the in-store advertising and promotions market to coerce CPGMs into purchasing its FSIs.  As

indicated above, Valassis defines the in-store advertising and promotions market as a *nationwide*

market consisting of supermarkets, drug stores, and other retailers.  However, Valassis

inexplicably focuses its market power allegations on a narrow segment of that market – the top

ten grocery chains in the county.  Valassis thereby ignores the other grocery stores, drug stores

and other retail outlets that, by its own allegations, are a part of the nationwide in-store

advertising and promotions market.  This inexplicable limitation is fatal to Valassis' tying claim.

Valassis has neither alleged in its complaint nor attempted to argue that a sub-market exists

consisting of only the top ten revenue-producing grocers in the county.  Further, Valassis has

neither alleged nor argued that the grocers News has contracted with represent a substantial

share of the overall in-store advertising and promotions market.  Taken as true, Valassis'

allegations demonstrate, at best, that News controls a narrow segment of that market by virtue of

its exclusive contracts.[6]  There are no facts alleged from which it could reasonably be inferred

---

[6]There may be some correlation between a grocer's revenue and the share of the in-store
advertising and promotions market that grocer represents, but that is not necessarily so.  To use

-16-

that News possesses market power in the in-store advertising and promotions market consisting of *all* grocers, drug stores, and other retail outlets. Accordingly, Valassis has failed to state a tying claim on which relief may be granted.

### C.  Count Two – Attempted Monopolization Claim Under § 2 of the Sherman Act

In Count Two of its complaint, Valassis alleges that News has "willfully and purposefully engaged in a pattern of anti-competitive conduct...designed to monopolize the FSI market," in violation of § 2 of the Sherman Act.  Compl. ¶ 39.  Valassis contends that if News' alleged anti-competitive activities are not enjoined, there exists a dangerous probability that News will "effectively monopolize the FSI market."  Compl. ¶ 41.  News contends that the facts alleged in the complaint are insufficient to state an attempted monopolization claim on which relief may be granted.

Section 2 of the Sherman Act renders it unlawful for any person to "attempt to monopolize...any part of the trade or commerce among the several States[.]" 15 U.S.C. § 2. Attempted monopolization under § 2 occurs when (1) a competitor has engaged in anticompetitive conduct (2) the competitor has acted with the specific intent to monopolize the relevant market, and (3) there exists a dangerous probability that the competitor will achieve monopoly power.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S.Ct. 884,122 L.Ed.2d 247 (1993); see also NicSand, supra, 457 F.3d at 542.  "Anticompetitive conduct is

─────────────────────

an oversimplified example, if the top grocery chain in the country generated 25 percent of the revenue for the entire industry, but allowed no in-store promotional products to be placed in its stores, that grocer would, obviously, represent zero percent, not 25 percent, of the in-store market.  Thus, an allegation that News has exclusive contracts with grocers representing 68 percent of the revenue of the top ten grocery chains in the country, standing alone, does not necessarily mean that News has market power in a market consisting only of the top ten grocers, let alone show that News has market power in a market consisting of all grocers, drug stores, and other retailers.

-17-

conduct designed to destroy competition, not just to eliminate a competitor." Richter Concrete
Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 823 (6th Cir. 1982). A wide variety of acts can
constitute anticompetitive conduct, including "a refusal to deal, price fixing arrangements,
predatory pricing, the bad faith assertion of trade secrets or rights granted under the patent and
copyright laws, tying arrangements, and inducing a rival company's employees to be disloyal."
Antitrust Laws and Trade Regulation, supra, n. 3, ¶ 26.01[3] (Kalinowski, *et al.*)(citing cases).
Specific intent to monopolize may be proved by direct evidence, but since such evidence does
not exist in most cases, intent may also be inferred from the defendant's anti-competitive
conduct. D.E. Rogers Associates, Inc. v. Gardner-Denver Co., 718 F.2d 1431, 1435 (6th Cir.
1983)("[E]vidence of anticompetitive conduct may be used to support a finding of intent where
direct evidence of intent is unavaliable."). With respect to the third element, "[m]arket share is
the principal measure used by courts to determine if there is a dangerous probability of success
in achieving monopoly power." Antitrust Laws and Trade Regulation, ¶ 26.01[4][b]
(Kalinowski, *et al.*)(citing cases). As the Sixth Circuit stated in Richter, 691 F.3d at 826, "[t]he
greater a firm's market power the greater the probability of successful monopolization. In order
to be found liable for attempted monopolization, a firm must possess market strength that
approaches monopoly power – the ability to control prices and exclude competition."

Valassis' attempted monopolization claim is based upon the alleged tying arrangement.
Again, Valassis alleges that News has executed contracts with several grocery chains that give
News the exclusive right to place in-store advertising and promotional products in the grocers'
stores and that News has used these contracts to coerce CPGMs into executing long-term FSI

contracts with News.  As noted above, a tying arrangement may constitute anticompetitive conduct for the purpose of a § 2 attempted monopolization claim.

Valassis contends that CPGMs have executed long-term FSI contracts with News not because News has offered a superior product or a better deal, but for the sole purpose of avoiding substantial price penalties on the in-store advertising and promotions products offered by News. There is no legitimate competitive purpose for using threats to coerce the execution of long-term FSI contracts, and such conduct would undoubtedly harm competition in the FSI market.  The court therefore concludes that Valassis' allegations regarding the tying arrangement are sufficient to satisfy the anticompetitive conduct element of its attempted monopolization claim. Further, given the absence of any legitimate business purpose for using threats to extract long-term FSI contracts from CPGMs, the specific intent to monopolize may be inferred from the alleged anticompetitive conduct.  Valassis has therefore satisfied the first two elements of its attempted monopolization claim.

The allegations of its complaint are, however, insufficient to demonstrate that there is a dangerous probability that News will achieve monopoly power in the FSI market.  It is difficult to conceive of how News could monopolize the FSI market through the use of exclusive contracts obtained by virtue of its alleged power in the in-store market when, according to the allegations of the complaint, News controls, at best, a small segment of the overall in-store market.  If it lacks sufficient market power in the in-store market to coerce CPGMs into executing long-term FSI contracts, then any attempt to monopolize the FSI market by the attempted use of such coercive activities would be doomed to failure.

The complaint otherwise lacks allegations from which it could reasonably be inferred that there exists a dangerous probability that News will achieve monopoly power.  Valassis' alleges that "there is a dangerous probability that, left unchecked, the NEWS Defendants will effectively monopolize the FSI market."  Compl. ¶ 41.  However, this is nothing more than a legal conclusion, which the court is not required to accept.  See Kottmyer, supra, 436 F.3d at 688 (In reviewing 12(b)(6) motion, courts "need not...accept as true legal conclusions or unwarranted factual inferences.").  As noted above, market share is the primary factor courts look to in determining whether there is a dangerous probability of success in achieving monopoly power. The complaint contains no allegations regarding News' share of the FSI market, whether News' market share significantly increased when it implement the alleged tying scheme, or whether News' market share has continued to grow since it implemented this scheme.  Failure to allege adequate market share may alone constitute grounds for dismissal of an attempted monopolization claim.  See, e.g., Lockheed Martin Corp. v. Boeing Co., 314 F.Supp.2d 1198, 1229 (M.D.Fla. 2004)(Attempted monopolization claim dismissed on 12(b)(6) motion where complaint contained no allegations regarding defendant's market share in relevant market); Valet Apartment Services, Inc. v. Atlanta Journal and Constitution, 865 F.Supp. 828, 832-33 (N.D.Ga. 1994)(Attempted monopolization claim dismissed and request to amend denied based upon failure to allege market share); Cohen v. Primerica Corp., 709 F.Supp. 63, 66 (E.D.N.Y. 1989)(Defendant's 19 percent share of relevant market insufficient as matter of law to sustain monopolization and attempted monopolization claims); Springfield Terminal Rwy. Co. v. Canadian Pacific Ltd., 133 F.3d 103 (1st Cir. 1997)(10 percent market share insufficient to support attempt claim); ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc., 249 F.Supp.2d

622, 648 (E.D.Pa. 2003)(25 percent market share presumptively insufficient to establish requisite market power); PHILLIP E. AREEDA & HERBERT HOVENKAMP, Antitrust Law § 807(d) (2d ed. 2002)(Suggesting that attempt claims involving less than 30 percent market share should be presumptively rejected).

Market share is not the sole determinant of whether a dangerous likelihood of achieving monopoly power exits.  See, e.g., Tarrant Service Agency, Inc. v. American Standard, Inc., 12 F.3d 609, 615 (6th Cir. 1993).  Courts must consider a number of other factors in examining the dangerous likelihood element, including the "strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand."  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 98 (2nd Cir. 1998)(quoting International Distrib. Ctrs., Inc. v. Walsh Trucking, 812 F.2d 786, 792 (2d Cir. 1987)); see also Richter Concrete Corporation, 691 F.2d at 826 ("Market share alone, however, is not enough to determine a firm's capacity to achieve monopoly power."). However, the complaint lacks sufficient allegations regarding market conditions to give rise to an inference that News is dangerously likely to achieve monopoly power.  Valassis contends that the fact that there are only two competitors in the FSI market – it and News – is relevant to the question of whether a dangerous likelihood of success exists.  It also contends that the "FSI market...has unique characteristics that make entry into the FSI market both extremely difficult and expensive," and that this factor must also be considered.  Compl. ¶ 16.  While the duopolistic nature of the market and market entry barriers are indeed relevant to the dangerous likelihood of success determination, Valassis' cursory allegations regarding these factors are

-21-

insufficient to demonstrate market power in the absence of allegations regarding News' share of the FSI market.[7]

### D.  Count Three – Predatory Pricing Under § 2 of the Sherman Act

In count three of its complaint, Valassis alleges that News has engaged in predatory pricing in violation of § 2 of the Sherman Act.  "Pricing is predatory when a company forgoes short-term profits in order to develop a market position such that the company can later raise prices and recoup profits."  Richter Concrete Corp., 691 F.2d at 823.  Price reductions based upon legitimate competitive objectives are not predatory.  Id. Such conduct is prohibited under § 2 of the Sherman Act only where it is harmful to competition:

> Although antitrust law is not usually concerned with setting a limit on price competition, under certain conditions low prices may have anticompetitive effects.  A firm that drives out, excludes, or disciplines rivals by selling at nonremunerative prices is not competing on the merits, but engaging in behavior that may properly be called predatory.  Antitrust therefore includes a "predatory pricing" offense within the proscription of monopolization in § 2 of the Sherman Act[.]
>
> In its classical form predatory pricing involves an immediate sacrifice of profits through unreasonably low prices.  These low prices destroy rivals or intimidate them from selling at a lower price than the defendant charges.  Then follows a "recoupment" period, during which the defendant enjoys monopoly prices or profits.  In order for predatory pricing of this variety to be a rational strategy, recoupment gains, discounted to present value, must exceed the immediate losses from the predatory campaign

AREEDA & HOVENKAMP, Antritrust Law § 723a.

---

[7]The fact that Valassis and News are the primary competitors in the FSI market, standing alone, says nothing about News' market share or its overall market power.  It cannot be presumed that News has substantial market share or power simply because it has only one main competitor.

To prevail upon a predatory pricing claim under § 2 of the Sherman Act, the plaintiff must plead and prove (1) that the "prices complained of are below an appropriate measure of its rival's costs[,]" and, (2) that the defendant had a "dangerous probability...of recouping its investment in low cost prices."  Brooke Group v. Brown & Williamson Tobacco, 509 U.S. 209, 222, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); see also Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.2d 917, 937, 947 (6th Cir. 2005).  Regarding the second element, "the defendant must be shown to have expected that the cut-throat prices would reasonably lead to its market dominance, to the point that it could later raise prices and recoup its losses incurred by selling at a predatory price."  Wheeling-Pittsburgh Steel Corp. v. Mitsui & Co., 35 F.Supp.2d 597, 602 (S.D.Ohio 1999).

Valassis alleges the following in its complaint in support of its predatory pricing claim:

> 47.  When considering the effects of the in-store price leveraging, the NEWS Defendants have offered and/or sold FSIs to some customers of the FSI market at an effective net price below the appropriate measure of cost of producing the advertisements offered or sold.
>
> 48.  The NEWS Defendants offered and/or sold the FSIs to customers at an effective net price below the applicable relevant cost with the intent of driving VALASSIS, their only significant competitor in the FSI market, out of the FSI market.
>
> 49.  Because there are only two significant competitors in the FSI market, the NEWS Defendants have a dangerous probability of recouping their costs by driving out or disciplining competition using monopoly power to recover the expense of a predatory pricing strategy by raising prices to an artificially high level.  In fact, NEWS' actions in the in-store monopoly power to raise prices and otherwise gain competitive advantage.
>
> ...
>
> 52.  If unabated by this Court, the NEWS Defendants' actions will continue to cause increasing harm to the FSI market.

-23-

These allegations are both vague and conclusory and, as such, are plainly insufficient to state a predatory pricing claim.  Valassis has done nothing more than recite the buzzwords used by courts in describing the required elements of a § 2 predatory pricing claim.  See, e.g., John's Insulation, Inc. v. Siska Const. Co., Inc., 774 F.Supp. 156, 163 (S.D.N.Y. 1991)("[C]oncluslory allegations which merely recite the litany of antitrust will not suffice."); Creative Copier Services v. Xerox Corporation, 344 F.Supp.2d 858, 867 (D.Conn. 2004)("CCS has alleged nothing in support of the second element, other than the vague and insufficient allegations that Xerox hoped to have a monopoly in the service market.").  It has alleged no facts in support of its claim.  The only facts alleged in the complaint are those related to the tying arrangement between News' in-store products and its FSIs, and there is nothing in those allegations that could reasonably give rise to a predatory pricing claim.

Moreover, Valassis' predatory pricing claim suffers from the same defect as its attempted monopolization claim – a failure to allege sufficient facts demonstrating that News possesses substantial market power in the FSI market.  In every § 2 monopolization case, whether it be based upon allegations of a completed monopoly or allegations of attempt to monopolize, the plaintiff "must prove substantial market power in a properly defined relevant market."  AREEDA & HOVENKAMP, Antitrust Law ¶ 728a.  Market power is a necessary element of predatory pricing claim because, as professors Areeda and Hovenkamp explain, it would be extraordinarily difficult, if not impossible, for a competitor with little or no market power to recoup the losses it sustained as a result of its below-cost pricing:

> As the would-be predator's rivals are larger or more numerous, the
> likelihood decreases that it can outlast and ruin enough of them to
> become the dominant survivor.  It is no accident that the literature
> focuses on the monopolist or near-monopolist who squeezes out

-24-

> minor rivals or discourages the entry of new firms.  A predatory
> struggle between minor firms or between equivalent substantial
> firms must be regarded as extremely rare.
>
> For these reasons, predation is usually assumed to be possible, if at
> all, only for a dominant firm with a very substantial market share.
> Given the variety of factors affecting the minimum size for
> plausible predation, no single market share number can be offered
> as a guaranteed minimum.  Nevertheless, we suggest a strong
> presumption that Sherman Act predation is unreasonable at market
> shares below 60 percent.

AREEDA & HOVENKAMP, Antitrust Law ¶ 728b; see also, generally, Spirit Airlines, Inc. v.

Northwest Airlines, Inc., 431 F.3d 917 (6th Cir. 2005).  Valassis' complaint contains no

allegations regarding News' share of the FSI market, nor does it contain sufficient factual

allegations regarding barriers to entry or other market conditions to demonstrate that News

possesses substantial power in the FSI market.  Accordingly, in addition to the reasons stated

above, Valassis has failed to state a predatory pricing claim on which relief may be granted for

the reason that Valassis cannot establishment a likelihood of recoupment in the absence of

allegations of market power.

### E.  State Law Claims

As indicated above, in addition to its federal claims, Valassis alleges several state law

claims: (1) a claim of tortious interference with a business relationship or expectancy, (2) unfair

competition claims under the laws of Connecticut (Conn. Gen. Stat. § 42-110a *et seq*.), Nebraska

(Neb. Rev. Stat. § 59-1601 *et seq*.), North Carolina (N.C. Gen. Stat. § 75-1.1 *et seq*.), South

Carolina (S.C. Code Ann. § 39-5-10 *et seq*.), Utah (Utah Code Ann. § 13-5-2.5 *et seq*.), and

Washington (Wash. Rev. Code § 19.86.020 *et seq*.), (3) an unfair trade practice claim under

California law (Cal. Bus. & Prof. Code § 17000 *et seq.*), and (4) a claim alleging a violation of California's Cartwright Act (Cal. Bus. & Prof. Code § 16720 *et seq.*).

Having concluded that Valassis has failed to state a federal claim on which relief may be granted, the court recommends that plaintiff's state law claims be dismissed without prejudice. See Taylor v. First of America Bank - Wayne, 973 F.3d 1284, 1287 (6th Cir. 1991)("Generally, 'if the federal claims are dismissed before trial,...the state claims should be dismissed as well.'")(citation omitted); see also 28 U.S.C. § 1367(c)(3). Should Valassis be permitted to amend its complaint to cure the flaws in its federal claims, which this court believes would be the appropriate course of action, dismissal without prejudice of the state law claims would still be appropriate. Under 28 U.S.C. § 1367(c)(2), a court may decline to exercise supplemental jurisdiction over state law claims where those claims "substantially predominate[] over the claim or claims over which the district court has original jurisdiction." Valassis has alleged nine state law claims under the laws of eight different states, as opposed to only three federal claims. The state law claims would require proof of facts not related to the federal claims, and, should these claims reach trial, the district court would be required to instruct the jury under the laws of eight different states regarding the elements of the claims and the relief available under each state's law, resulting in potential juror confusion. In addition, considerable judicial resources would be expended in adjudicating these claims. For these reasons, the court concludes that the state law claims substantially predominate over the federal claims.

**IV. Conclusion**

For the reasons stated above, the court recommends that News' motion to dismiss be **GRANTED** as to Valassis' federal claims and that those claims be **DISMISSED WITH**

**PREJUDICE** unless Valassis files an amended complaint curing the pleading deficiencies discussed above.  The court further recommends that the motion be **GRANTED** as to Valassis' state law claims and that those claims be **DISMISSED WITHOUT PREJUDICE**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

                                              S/VIRGINIA M. MORGAN
                                              VIRGINIA M. MORGAN
Dated: September 28, 2006            UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

The undersigned certifies that the foregoing order was served upon counsel of record via the Court's ECF System and/or U. S. Mail on September 28, 2006.

s/Kendra Byrd
Case Manager to
Magistrate Judge Virginia M. Morgan